Edward ADLER, et al., Plaintiffs,

v.

BERG HARMON ASSOCIATES,
et al., Defendants.

No. 89 Civ. 8114 (WCC).

United States District Court,
S.D. New York.

March 29, 1993.

Beigel & Sandler, New York City (Bijan Amini, Alexander T. Moore, of counsel), for plaintiffs.

Skadden, Arps, Slate, Meagher & Flom, New York City (William P. Frank, Steven Kronengold, Peretz Bronstein, of counsel), for Primerica Corp., Berg Enterprises, Inc. and Kenneth Berg.

Jacobs Persinger & Parker, New York City (I. Michael Bayda, of counsel), for Harmon Envicon Associates, f/k/a Berg Harmon Associates, Harmon Associates, Robert T. Harmon, Charles N. Loccisano and Southern Ventures, Inc., f/k/a Berg Ventures, Inc.

## OPINION AND ORDER

WILLIAM C. CONNOR, District Judge.

Plaintiffs Edward Adler, et al bring this action against Harmon Envicon Assoc., f/k/a Berg Harmon Assoc.; Harmon Assoc.; Robert T. Harmon; Charles N. Loccisano; and Southern Ventures, Inc., f/k/a Berg Ventures, Inc. (the Harmon defendants) and Primerica Corp.; Breg Enterprises, Inc.; and Kenneth Berg (the Berg defendants) for violations of § 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b–5 promulgated thereunder; Racketeering and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.;* and for common law fraud, negligence, and breach of fiduciary duty. The action is presently before the Court on defendants' motion to dismiss and, in the alternative, for summary judgment.

## PROCEDURAL HISTORY AND BACKGROUND

The original complaint in this action was filed on December 7, 1989. On June 20, 1991, two Supreme Court decisions created a uniform, retroactive 1– and 3–year limitations period for actions brought under § 10(b) of the Securities and Exchange Act. *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* —— U.S. ——, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991) (establishing the period of limitations); *James B. Beam Distilling Co. v. Georgia,* —— U.S. ——, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991) (applying *Lampf* retroactively). As a result, plaintiffs amended their complaint deleting the § 10(b) claim except to the extent that it served as a predicate for the RICO action. Defendants then filed a motion to dismiss under Rules 9(b) and 12(b)(6), Fed.R.Civ.P. The motion was granted with leave to refile by an opinion and order of this Court dated April 7, 1992. Meanwhile, Congress amended the Securities and Exchange Act of 1934 by enacting § 27A which modified the retroactive effect of *Lampf.* Pursuant to this amendment, plaintiffs were permitted to reinstate their § 10(b) claims by an opinion and order of this Court dated April 27, 1992. The action is now before the Court on defendants' second motion to dismiss or, in the alternative, defendants' motion for summary judgment.

We assume familiarity with our two prior decisions and therefore give only a brief summary of the underlying transaction. In the early 1980's Berg Harmon, a joint venture between Harmon Assoc. and Berg Ventures, Inc., syndicated and promoted the sale of limited partnership interests in 50 real estate tax shelters. The partnership units were marketed to a limited number of investors through the use of private placement memoranda (PPM). The investments lost most of their value in the late 1980's. The investor-plaintiffs claim that the decline was due to the inevitable collapse of defendants' pyramid or "Ponzi" scheme which was fraudulently concealed in the PPMs.

Plaintiffs claim to have been defrauded in four ways. First, by false assertions in the PPMs that the properties which the partnerships purchased had sufficient rental reve-

nues to cover their current operating expenses and primary debt service. Compl. ¶ 11(a), 13. Second, by failure of the PPMs to disclose the fact that the affiliate hired to manage the properties, for a percentage of the rental revenue, actually performed no management services. Compl. ¶ 11(b). Third, by defendants' failure to disclose commissions that were paid to their purchasing representatives. Compl. ¶ 11(c). Finally, by defendants' failure to disclose loans, made by the general partners to the partnership, to cover operating deficits on each property. Compl. ¶ 12.

## DISCUSSION

There are two distinct motions made by defendants in this case. All defendants move to dismiss the complaint under Rule 9(b) and 12(b)(6) or, in the alternative, for summary judgment. The basis of this motion is that the alleged misstatements and omissions do not support a claim for securities fraud. Since this motion, if granted, would dispose of the entire case, we address it first. The Berg defendants, while joining their codefendants' motion, also move to dismiss the complaint under Rule 9(b) for its failure sufficiently to allege their connection to the fraudulent conduct and the RICO enterprise.

1. Similarly, a motion to dismiss for failure to state a claim under Rule 12(b)(6) should only be granted if it appears on the face of the complaint that plaintiff can prove no set of facts that would support its claim for relief. *Anderson v. Coughlin*, 700 F.2d 37, 40 (2d Cir.1983).

2. Plaintiffs argue that we should disfavor the summary judgment portions of defendants' motion because defendants' objections to plaintiffs' document requests have prevented them from completing their discovery. We do not agree. When defendants were given leave to make this motion, we lifted the stay on discovery to give plaintiffs the opportunity to craft their opposition. When a discovery dispute arises, we require that the aggrieved party schedule a conference with the Court in which the dispute is discussed and, in most cases, resolved. Plaintiffs made no indication during the briefing period that defendants were not complying with their discovery requests; instead they raise their objections only now in opposition to defendants' motion. In addition, we granted plaintiffs a one month extension in the briefing schedule to prepare their opposition. We feel that a discovery

### I. The Motion by All Defendants to Dismiss or for Summary Judgment

Summary judgment is granted only when, after drawing all reasonable inferences in favor of the party opposing the motion, no reasonable trier of fact could find for the nonmoving party. *Lund's, Inc. v. Chemical Bank*, 870 F.2d 840, 844 (2d Cir.1989).[1] A summary judgment is not appropriate where material factual matters are in dispute. *National Union Fire Ins. Co. v. Turtur*, 892 F.2d 199, 203 (2d Cir.1989). However, if one party puts forth evidence on an issue, the other party can not avoid summary judgment by resting solely on contentions in its pleadings. 56(e), Fed.R.Civ.P.[2]

### A. The Securities Fraud Claim

In order to prevail on a claim for securities fraud under § 10(b) and Rule 10b–5 plaintiffs must show that defendants made material misstatements or omissions with scienter, and that plaintiffs relied on the misrepresentations and suffered a loss caused thereby. *Burke v. Jacoby*, 981 F.2d 1372, 1378 (2d Cir.1992). Plaintiffs' third amended complaint alleges four misstatements or omissions in the PPM which form the basis of the securities fraud claim. Defendants have failed to demonstrate that the first alleged misstatement could not support plaintiffs' claim. Thus, the motion to dismiss is denied.[3] However, plaintiffs' three other

dispute raised by plaintiff at this juncture is not made in an attempt to complete its discovery but only in an attempt to further delay these proceedings. Furthermore, summary judgment is granted only as to plaintiffs' second allegation, and plaintiffs fail adequately to specify, as required by Rule 56(f), Fed.R.Civ.P., which documents have not been produced and how these documents may affect this portion of the motion. Amini Aff. ¶¶ 5–6; *see Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 926 (2d Cir.1985). Therefore, we will consider defendants' summary judgment motion.

3. Since this sub-paragraph of the complaint relies solely on a statement in the PPMs and incorporates the PPMs by reference, this portion of defendants' motion is a motion to dismiss and need not be converted into a motion for summary judgment. *I. Meyer Pincus & Assoc. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir. 1991) (prospectus solely relied upon by plaintiff examined in determining a motion to dismiss, in spite of the fact that it was not attached to complaint or incorporated therein by reference).

fraud allegations do not support their claim, and are therefore dismissed.

### 1. The Undisclosed Operating Deficit

■ The PPMs stated that the rent on each property was sufficient to pay its current normal operating expenses and to meet the debt service on the first mortgage. L.T. PPM at 26; C.C. PPM at 32; F.H. PPM at 27. The complaint alleges that in fact all the properties were experiencing operating deficits and that the deficits in the Tree Lake, Friendly Hills, and Country Club Apartments were $100,000, $1,200,000, and $900,000 respectively. Compl. ¶¶ 11(a), 13. Plaintiffs claim that defendants made these statements knowing them to be untrue; that plaintiffs relied on these statements; and that the operating losses ultimately made their securities worthless.

Defendants argue that these statements in the PPMs were not materially false or misleading. Defendants assert plaintiffs' calculations fail to account for lump sum interest payments and repair expenses which the "Projections" sections of the PPMs assumed would be paid out of the proceeds of the offer. Defendants purport to correct for these assumptions and to show that two properties had no deficit and another had a deficit much smaller than that claimed by plaintiffs.[4]

There are three reasons why defendants' argument is insufficient to support this motion to dismiss. First, the PPMs represented that the *present* rents were sufficient to cover operation costs and first mortgage debt service, while defendants' argument is based to a large degree on predictions of future rents. Defendants present no evidence that these figures represent the actual rents and expenses at the time the statements were made, and the fact that these figures appear in the "Projections" portion of the PPMs suggests that they are not actual financial data. Second, even if these calculations were made from actual financial figures, defendants' own calculations show a deficit, albeit much smaller than that claimed by plaintiff, in one of the properties. Finally, defendants only make the calculations as to three of the forty-one limited partnerships at issue. Although our prior decision accepted these PPMs as representative of all those at issue, only the generalized representations, common to all the PPMs, were at issue at that time.[5] Defendants' own analysis shows that the rents, expenses, debt service, and the assumptions used to calculate a deficit differed from property to property. We will not dismiss a complaint which alleges that there were material misstatements in forty-one PPMs on defendants' analysis of only three. Thus, defendants' motion to dismiss the complaint as to the first alleged misstatement is denied.

### 2. The Undisclosed Failure of the Managing Affiliate to Actually Manage the Properties

■ The second misstatement or omission alleged in the complaint concerns a statement in the PPMs that an affiliate of the general partner, First Realty Management Consultants (First Realty), had been retained

---

**4.** The projections section of the Tree Lake Apartments PPM indicates that the one-month 1983 rents were $88,300 annualized to $1,059,000 and the operating expenses were $41,500 annualized to $498,000. T.L. PPM Projections. The first mortgage service costs were $49,000 annualized to $588,000. These assumptions yield a deficit of $27,000, but this was eliminated by the fact that the operating expenses were assumed to be diminished by the portion of the proceeds of the offering which was to be set aside for repairs and maintenance. *See Id.* at Note 8 and at 25.

The projections section of the Country Club Apartments PPM indicates that two-month 1984 rents were $342,400 annualized to $2,054,400 and operating expenses were $202,000 annualized to $1,212,000. C.C. PPM Projections. The monthly debt service was $72,669.96 annualized to $872,040. These assumptions yield a deficit of $29,640, but this was eliminated by the fact that the operating expenses were assumed to be diminished by the amount of the proceeds of the offering which were to be set aside for repairs and maintenance. *Id.* at Note 8 and at 29.

The projections set forth in the Friendly Hills Apartments PPM indicates five-month rents in 1984 were $986,100 annualized to $2,366,640 and operating expenses were $455,100 annualized to $1,092,240. F.H. PPM Projections. The monthly debt service was $104,380.46 annualized to $1,252,565. *Id.* at Note 5. These assumptions yield a small deficit of $21,000.

**5.** *Adler v. Berg Harmon Assoc.*, 790 F.Supp. 1222, 1230 n. 8 (S.D.N.Y.1992) (*Adler I*).

to manage the property for a fixed percentage of the rental receipts. In addition, the PPMs state that the managing agent may be reimbursed for certain expenses including the salary paid to First Realty's area manager. T.L. PPM at 52; F.H. PPM at 57; C.C. PPM at 62. The complaint alleges that this representation was misleading because the PPMs failed to disclose that the managing affiliate performed no function other than hiring professional management for which an additional expense was charged to each property. Compl. ¶ 11(b). However, the undisputed affidavit and documents submitted by the parties demonstrate that this assertion is without merit. The affidavit of defendant, Charles N. Loccisano, indicates that First Realty had staffed headquarters in New Jersey and maintained a staff on the site of each property; Loccisano enumerated the exclusive management tasks that First Realty performed; and his affidavit was supported by First Realty's workman's compensation insurance policy which listed its extensive staff. Loccisano Aff. ¶¶ 12–16; Defs' Ex. 11. In addition, any expenses that were born by the partnerships were disclosed in the PPMs. Loccisano Aff. ¶ 17. Plaintiffs submit financial statements for three properties which state that the day-to-day management was performed by an affiliate of the general partner for the fee specified in the PPM, which supports defendants' argument.[6] Thus, the PPM need not and should not have disclosed that First Realty did not actually perform managerial service because the undisputed facts demonstrate that it did.[7]

### 3. The Undisclosed Commissions to Purchasing Representatives

The complaint alleges defendants knew but failed to disclose commissions paid to plaintiffs' purchasing representatives. Thus,

plaintiffs claim they were induced to invest in Berg Harmon partnerships by advisors whose recommendations were made without regard for the quality of the investment. Compl. 11(c). Finkle & Co. (Finkle) is claimed to be the purchasing representative for 10 to 15% of plaintiffs and is alleged to have mislead these plaintiffs by disavowing any compensation as a result of the sale. *Id.* However, this allegation does not comply with the requirements of Rule 9(b).

Rule 9(b) requires that all averments of fraud be made with particularity. The purpose of this requirement is (1) to provide defendants with fair notice of plaintiffs' claim, (2) to protect defendants' reputation or good will, and (3) to reduce strike suits. *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989). To support a claim of fraud by omission, Rule 9(b) requires that the complaint allege (1) what omissions they were, (2) the person responsible for the failure to disclose, (3) the context of the omissions and the manner in which they misled the plaintiffs, and (4) what defendant obtained through the fraud. *Gould v. Berk & Michaels,* 1991 WL 152613, *3 (S.D.N.Y.1991).

The allegation in question is flawed in that it identifies only one purchasing agent, Finkle, who is alleged to be responsible for only 10 to 15% of the plaintiffs who participated in Berg Harmon partnerships. If the remaining 85 to 90% of the plaintiffs had purchasing representatives, the complaint does not reveal their identity, nor does it disclose which plaintiffs were represented by Finkle. Thus, plaintiffs have failed to allege the substance and circumstances of the omission with sufficient particularity to give defendants fair notice of the claim. *See Moore v. Kayport Package Express, Inc.,* 885 F.2d

---

**6.** Plaintiffs cite these reports to show that the general partnership had administrative expenses of its own including salaries, advertising, legal fees, and office expenses. *See e.g.,* Pl's Ex. B (Tree Lake—Financial Statement 1986 at 11, note 7; Financial Statement 1987 and 1988 at 11 note 7). However, this does not support the conclusion that First Realty charged these expenses to the partnership or that it was not performing its management functions. Indeed on the same page of the same financial statements cited by plaintiffs, the reports state that

the day-to-day management of the properties was performed by an affiliate of the general partner for the fee specified in the PPM. *See e.g. Id.* at 11 Note 6.

**7.** Defendants make additional arguments that this alleged misstatement was not material and did not cause the plaintiffs' loss. Harmon Defs' Br. in Sup. at 10. Since defendants have shown that the statements were not untrue, we need not reach these questions.

531, 540 (9th Cir.1989) (complaint did not comply with Rule 9(b) because it did not allege which plaintiffs made purchases through the stock broker-defendants).[8]

■ In the same paragraph of their complaint, plaintiffs allege that all their purchasing agents fraudulently claimed that they had a back-end interest in the partnerships and that they would not profit unless their clients profited. Compl. ¶ 11(c). This allegation also fails to comply with Rule 9(b). Finkle is the only purchasing agent whose identity is revealed in the complaint and the complaint does not state when, where, how, or to whom Finkle made these statements. Therefore, this portion of the complaint is dismissed for its failure to comply with Rule 9(b). *See Id.*[9]

In *Adler I* we dismissed plaintiffs' first amended complaint for failure to plead the securities fraud allegations with the particularity required by Rule 9(b).[10] In that decision we put plaintiffs on notice that "[t]o be sufficient under Rule 9(b), a complaint must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identi-fy those responsible for the statements." *Id.* at 1227 (citing *Goldman v. Belden,* 754 F.2d 1059 (2d Cir.1985)). Nonetheless, as noted above, the complaint identifies only one of the alleged purchasing representatives and does not allege which of the plaintiffs were associated with that representative. Our prior decision not only gave plaintiffs' counsel the opportunity to correct its defective pleading, but also offered significant guidance on how to do so. Therefore, this claim of plaintiff's third amended complaint is dismissed with prejudice. *Posner v. Coopers & Lybrand,* 92 F.R.D. 765, 770 (S.D.N.Y.1981), *aff'd,* 697 F.2d 296 (2d Cir.1982) (dismissal with prejudice proper where plaintiff put on notice as to the deficiencies in complaint and fails to correct them in amended pleadings); *See O'Brien v. National Property Analysts Partners,* 936 F.2d 674, 676–77 (2d Cir.1991) (upholding Rule 9(b) dismissal with prejudice); *Brown v. The Hutton Group,* 795 F.Supp. 1317 (S.D.N.Y.1992) (plaintiffs second amended complaint dismissed with prejudice for failure to comply with Rule 9(b)).

Despite the hardships created by plaintiffs' flawed pleadings, defendants have produced uncontested evidence that most plaintiffs had

---

**8.** Plaintiffs contend that in *Schwartz v. Michaels,* 1992 WL 184527 (S.D.N.Y.1992) (J. Patterson) this Court upheld similar pleadings against a Rule 9(b) challenge. However, it appears that the undisclosed commission claim in *Schwartz* was more specifically pled than the claim at bar, *see Id.* at *3, and it is not clear whether this portion of the pleadings in *Schwartz* faced a Rule 9(b) challenge because the Court only analyzed defendants' Rule 12(b)(6) motion. *Id.* at 10*–12*. Therefore, *Schwartz* does not inform our Rule 9(b) analysis.

**9.** Defendants also argue that the complaint does not allege facts sufficient to support a finding that the undisclosed commissions paid to plaintiffs' purchasing representatives caused plaintiffs' loss. *Citibank, N.A. v. K–H Corp.,* 968 F.2d 1489, 1494 (2d Cir.1992) (10b–5 claim requires a showing of both transactional and loss causation). In a suit for failure to disclose the underqualifications of a purchasing representative, the Second Circuit held that the omission caused the transaction because it induced the investors to buy the stock and caused the loss because it induced the investor to hold the stock as it declined in value. *Marbury Management, Inc. v. Kohn,* 629 F.2d 705, 708–710 (2d Cir.), *cert. denied,* 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980). *Marbury* is not applicable here be-cause the undisclosed commissions could not have caused plaintiffs to hold their limited partnerships since there was no secondary market in which the limited partnerships could have been sold. *See e.g.,* T.L. PPM at 16, 21, 30; Defs' Ex. 1 subscription agreement ¶¶ 3(C)(d), 7. However, in two subsequent cases the Second Circuit changed the focus of loss causation analysis to whether the misstatement or omission goes to the quality of the investment. *Bennett v. United States Trust Co. of New York,* 770 F.2d 308, 314 (2d Cir.1985); *Manufactures Hanover Trust v. Drysdale Securities Corp.,* 801 F.2d 13, 22 (2d Cir.1986), *cert. denied,* 479 U.S. 1066, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987). *Bennett* and *Manufactures Hanover Trust* indicate that the existence of a secondary market is no longer necessary to establish that fraudulent omissions regarding purchasing representatives caused plaintiffs' loss. Indeed such was the holding in a case almost identical to the one at bar. *Schwartz v. Michaels,* 1992 WL 184527, *10 (S.D.N.Y.1992) (J. Patterson). However, since this portion of the complaint does not comply with Rule 9(b), we need not reach this argument.

**10.** However, in *Adler I* the securities fraud allegations were only plead as predicate acts for the RICO claim. Nonetheless they were dismissed for their lack of specificity.

notice of the commissions, if any, paid to their purchasing representatives. Loccisano's uncontested affidavit explains how the commissions were actually disclosed. In order to purchase an interest in a Berg Harmon partnership an investor had to acknowledge the receipt of the subscription agreement and execute a questionnaire which revealed whether or not the investor had a purchasing representative acting on his behalf. In cases where there was a purchasing representative, the representative also was required to execute a questionnaire. In addition the investor countersigned a letter from the representative setting out the relationship between the investor and the representative and disclosing any compensation that the representative was to receive. Loccisano Aff. ¶ 3. Defendants submit an example of the voluminous documentation that accompanied each purchase of an interest in a Berg Harmon partnership. Defs' Ex. 1. Loccisano's affidavit attests to a list of plaintiffs whose subscription agreement questionnaires did not identify a purchasing representative. Loccisano Aff. ¶ 4; Defs' Ex. 4. In addition, defendants submit letters in which many plaintiffs acknowledged the commissions, if any, that their purchasing representatives were to receive. Defs' Ex. 2 & 3. After 1983, Finkle was directly compensated by the partnership as a purchasing represen-

tative, and that fact was disclosed to the investors through acknowledged letters which defendants now submit to support their motion.[11] Def's Ex. 8. This undisputed evidence shows that the vast majority of plaintiffs were informed as to the commissions which their purchasing agents received.[12] Plaintiffs submit no evidence to dispute defendants' submissions, and therefore, even had plaintiff properly pled this fraud contention, defendants would have been entitled to summary judgment as to most plaintiffs on this claim.[13]

In the same paragraph of the complaint, plaintiffs allege that Berg Harmon filed "Form D" reports with the SEC which failed to disclose the commissions despite a requirement of such disclosure. Compl. ¶ 11(c). However, plaintiffs do not allege that they relied on the representations or omissions in the SEC reports, nor could plaintiffs have relied on the reports because SEC regulations require that they be submitted after the securities are purchased. 17 C.F.R. § 230.503(a). Thus, this allegation does not support plaintiffs' fraud claim.[14]

### 4. Undisclosed Loans From the General Partners to the Partnerships

The complaint alleges that the organizers of the partnerships fraudulently failed to dis-

---

**11.** In those cases where Finkle was the purchasing representative for investors prior to 1983, it received no direct commissions. However, Finkle's partners were compensated through an indirect ownership interest in Berg Harmon which gave them a pro-rata interest in the undistributed commissions retained by Berg Harmon. Investors represented by Finkle prior to 1983 signed letters in which Finkle's partners' interest in Berg Harmon was disclosed and in which Finkle claimed it would not receive any compensation as a result of plaintiffs' specific investment. *See* Defs' Ex. 7 (10 letters). These letters alone may not have completely disclosed Finkle's partners' interest in the undistributed commissions of Berg Harmon. However, two of the three PPMs submitted with the motion disclose that undistributed commissions would be retained by Berg Harmon. F.H. PPM at 26; C.C. PPM at 30. The combination of the letters and the statement in the PPM would adequately disclose Finkle's interest in the transaction. However, since plaintiffs' counsel has failed to allege which plaintiffs were represented by Finkle, we can not determine whether summary judgment would have been appropriate as to these 10 plaintiffs.

**12.** Plaintiffs' counsel contends that the "undisclosed" commissions paid to each purchasing representative, even if disclosed to the representative's client, misled those plaintiffs who had no purchasing representative. We find that the commissions received by each purchasing representative were material only to the investors he represented.

**13.** Defendants fail to produce letters acknowledging commissions for fourteen plaintiffs listed in defendants' exhibit 9 and only submits incomplete letters for two plaintiffs listed in defendants' exhibit 10. Thus, summary judgment would not have been appropriate as to these plaintiffs.

**14.** Similarly, plaintiffs allege they were defrauded via several letter sent after syndication. Compl. ¶ 14, 15. Since plaintiffs could not have relied upon these letters when they elected to purchase their interests, these claims are also dismissed.

close that a portion of their fees would be loaned back to the partnership to cover each property's operating deficit. Compl. ¶ 12. However, the PPMs had a separate section which disclosed the amount, and duration of and the interest on these loans.[15] T.L. PPM at 47; F.H. PPM at 46–47; C.C. PPM at 53–54. Therefore, there were no undisclosed loans on which the securities fraud claim may be based. To the extent that this paragraph alleges an undisclosed operating deficit, it is a restatement of paragraph 11(a) of the complaint discussed above.[16]

### B. The RICO Claim

Defendants' motion does not specifically address plaintiffs' RICO claim. Therefore, we assume defendants' sole argument to be that there are no predicate acts to serve as a basis for the RICO claim. Thus, to the extent the securities fraud claim has not been dismissed, the RICO claim also remains.

### C. The State Law Claims

█ The complaint alleges state law claims for fraud, negligence misrepresentation, and breach of fiduciary duty. To the extent that plaintiffs allege a federal securities fraud claim, they also allege a state law fraud claim. However, the negligent misrepresentation and breach of fiduciary duty claims are without merit. The bulk of plaintiffs' allegations refer to representations made prior to the sale, and defendants had no duty to plaintiffs under these two causes of action before the transaction. *Schwartz*, 1992 WL 184527, *29. Furthermore, after the securities were purchased, there was no secondary market in which plaintiffs might have sold their securities.[17] Therefore, plain-

tiffs could not have relied to their detriment on those few alleged post-sale misrepresentations and these statements could not have caused plaintiffs' loss. *Fane v. Zimmer, Inc.*, 927 F.2d 124, 130 (2d Cir.1991) (detrimental reliance is a necessary element of a negligent misrepresentation claim). *See Curley v. Brignoli Curley & Roberts Assocs.*, 746 F.Supp 1208, 1214 (S.D.N.Y.1989), *aff'd and remanded on other grounds*, 915 F.2d 81 (2d Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1430, 113 L.Ed.2d 484 (1991) (if one has fiduciary duty towards another he is liable for the harm resulting from a breach of that duty). Thus, the negligent misrepresentation and breach of fiduciary duty claims are dismissed.

### II. The Berg Defendants' Motion to Dismiss

This motion to dismiss is brought pursuant to Rules 9(b) and 12(b)(6), Fed.R.Civ.P., by defendants Primerica Corp. (Primerica), Berg Enterprises, Inc. (BEI), and Kenneth Berg (Berg). The Berg defendants claim that the complaint fails to plead fraud with particularity and that their connection to the alleged fraudulent enterprise is too attenuated to support a RICO claim.

### A. The Securities Fraud Claim

█ In cases like the one at bar, where plaintiffs charge multiple defendants with securities fraud, Rule 9(b) requires a specific allegation of each defendant's participation in the fraud. *Brickman v. Tyco Toys, Inc.*, 722 F.Supp. 1054, 1061 (S.D.N.Y.1989). However, no specific connection between the fraudulent representations in the PPMs. and each particular defendant is necessary where de-

---

15. Our prior opinion considered the three PPMs cited as representative of all those at issue. *Adler I*, at 1230 n. 8. Plaintiffs' submissions do not object to this practice and plaintiffs' third amended complaint also treats these three PPM as exemplary of the fraud alleged. *See* Compl. ¶ 11(a). We deviated from this policy in our analysis of the alleged undisclosed operating deficits because accounting data specific to each property was at issue. By contrast the structure of each PPM submitted indicates that the loans made to the partnership by its sponsors were

disclosed. Each PPM has an entire section dedicated to describing these loans. Therefore, for this claim we will consider the three submitted PPMs as representative of all those at issue.

16. Plaintiffs' brief discusses allegations in paragraph 11(d) of the complaint. However, there is no such paragraph in plaintiffs' third amended complaint.

17. *See e.g.*, T.L. PPM at 16, 21, 30; Defs' Ex. 1 subscription agreement ¶¶ 3(C)(d), 7.

fendants are "insiders" or "affiliates" participating in the offer of the securities in question. *Luce v. Edelstein*, 802 F.2d 49, 55 (2d Cir.1986). A defendant is considered an "insider" or an "affiliate" if he is tied to the allegedly fraudulent prospectus. *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1249 (2d Cir.1987). The Berg defendants claim that the allegations against them are based only on their corporate relationship to Berg Harmon and are therefore insufficient under Rule 9(b). *I. Meyer Pincus & Assocs. v. Oppenheimer & Co.*, 1989 WL 31676 (S.D.N.Y.1989) (identification of defendants solely on the basis of their corporate affiliation does not sufficiently connect any of them to the issuance of allegedly fraudulent statements in the prospectus). We disagree.

▮ The complaint does allege the corporate relationship between the entities. The limited partnerships at issue were syndicated and promoted by Berg Harmon, a joint venture between Berg Ventures and Harmon Assoc. Compl. ¶ 7. Berg Ventures was a subsidiary of BEI during the entire relevant period,[18] and in May of 1985, Primerica acquired BEI and ran it as a wholly owned subsidiary.[19] Compl. ¶¶ 5(f), 5(g). Berg was the president and director of Berg Ventures, president and chairman of the board of BEI and, after May of 1985, an officer and agent of Primerica. Compl. ¶ 5(c).

Although Berg's position with Berg Ventures is alone sufficient to make him a Berg Harmon insider, and therefore responsible for the alleged misstatement in the PPMs, *Adler I*, at 1228, 1235 (citing *Luce*, 802 F.2d at 55), the complaint also alleges that Berg supervised the preparation and issuance of

the PPMs, compl. ¶ 10; participated in all decisions made for Berg Harmon during the relevant period, compl, ¶ 7; and, as agent for Primerica, was charged with reviewing all syndications. Compl. ¶ 5(g). Thus, the complaint not only establishes Berg as a Berg Harmon insider but also sets out facts directly connecting him to the allegedly fraudulent PPMs. *See Sperber Adams Assocs. v. JEM Management Assocs. Corp.*, 1992 WL 138344, *5 (S.D.N.Y.1992) (director who prepared and distributed offering materials considered an "insider").

▮ Further, since all Kenneth Berg's actions are alleged to have been taken in his personal and corporate capacities, compl. ¶ 10, the third amended complaint, unlike its predecessor, sufficiently alleges both BEI's and Primerica's connection to the fraudulent PPMs. The two parent corporations are Berg Harmon insiders who are alleged to have participated in the drafting of the PPMs through the actions taken on their behalf by Berg, their high ranking officer. *See Adler I*, at 1228; *Kane v. Wichita Oil Income Fund*, 1991 WL 233266 (S.D.N.Y.1991) (complaint sufficient under Rule 9(b) because all defendants alleged to have participated in drafting the offering memorandum). Thus, the allegations against BEI and Primerica are sufficiently specific under Rule 9(b).[20]

**B. The RICO Claim**

▮ The Berg defendants claim that plaintiffs have insufficiently alleged their connection to the RICO enterprise and therefore the RICO claim must be dismissed. The relevant RICO provision states:

---

**18.** BEI sold Berg Ventures in 1987, but all the alleged fraudulent conduct occurred prior to the sale.

**19.** Primerica may only be held responsible for those statements made after the acquisition. The complaint alleges that the following partnerships were syndicated after May 1985: Village Apartments Assoc., Ltd.; Jockey Club Assoc., Ltd.; Polo Club Apartments Assoc., L.P.; Pinebrook Apartments Assoc., Ltd.; Ashley Lake Assoc.; Coachman Crossing Assoc., Ltd.; and Horizon Realty Group, Ltd.

**20.** The Berg defendants cite *Brickman v. Tyco Toys, Inc.*, 722 F.Supp. 1054 (S.D.N.Y.1989) which held that a parent-subsidiary relationship and interlocking directorates were insufficient to make the parent corporation an insider of the subsidiary. *Id.* at 1061. *Brickman* is distinguishable from the present case because in *Brickman* the directors were not alleged to have participated in drafting the fraudulent prospectus. By contrast Berg, the common officer in the case at bar, is alleged to have participated in the drafting of the PPMs.

It shall be unlawful for any person employed or associated with any enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. 18 U.S.C. § 1962(c).

To fall within this provision defendants must be involved in the "operation or management of the enterprise itself." *Reves v. Ernst & Young*, —— U.S. ——, ——, 113 S.Ct. 1163, 1173, 122 L.Ed.2d 525 (1993). Plaintiffs allege that they were misled by fraudulent PPMs issued by Berg Harmon in violation of the securities laws. As outlined above, the complaint states that Berg was one of the primary decision-makers for Berg Harmon charged with, among other things, supervising the drafting of the allegedly fraudulent PPMs. Thus, the RICO claim against Berg is sufficient because Berg managed the operations of the alleged RICO enterprise.

Our prior opinion dismissed the RICO claims against BEI and Primerica because plaintiffs' second amended complaint only alleged the corporate relationship between the entities and failed to allege that BEI or Primerica committed any of the requisite criminal acts. *Adler I*, at 1234. In contrast the complaint presently before the Court alleges that Berg was a high ranking agent of both BEI and Primerica, and that Berg managed the Berg Harmon enterprise in his personal and corporate capacities. Thus, from the face of the complaint, it appears that BEI and Primerica participated in the management and operation of the fraudulent enterprise through their agent Berg.[21] Therefore, the complaint adequately alleges the RICO claim against BEI and Primerica as well.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss and, in the alternative, for summary judgment on the securities law claims is granted as to all claimed misrepresentations and omissions except as to the alleged undisclosed operating deficits. Similarly, these alleged undisclosed deficits serve as the sole remaining fraud allegations on which plaintiffs' RICO claim is based. The state law fraud claim similarly remains, but the negligent misrepresentation and breach of fiduciary duty claims are dismissed. In addition, the Berg defendants' motion to dismiss the complaint for its failure to allege their connection to the securities fraud and RICO enterprise with sufficient particularity is denied.

**SO ORDERED.**

---

**21.** The Berg defendants claim that their position is analogous to that of the defendants in *Reves*. We disagree. In *Reves* the accounting method used by a farmers' cooperative (co-op) overvalued an asset on its balance sheet. The defendant, an accounting firm, audited the co-op, and its report, which was available to the board, revealed the method by which the asset was valued and expressed doubt whether the co-op's investment in the asset would ever be recovered. *Id.* —— U.S. at ——, ——, 113 S.Ct. at 1167, 1173. However, the firm used a summary of the audit which omitted the cautionary language during an oral presentation to the board, and public knowledge of the co-op's insolvency was delayed. The defendant in *Reves* was an instrument of the co-op's fraudulent scheme but did not participate in is management or operation. By contrast in the instant case Kenneth Berg, in his individual capacity and as the agent for BEI and Primerica, allegedly originated and supervised the fraudulent scheme. Thus, the Berg defendants were not merely the instruments by which another perpetrated a fraud.